## JOHN F. CUSICK *vs.* RALPH W. BARTLETT.

### Cumberland. Opinion January 1, 1898.

*Corporation. Directors. Stock. Unpaid Subscription. Trust. Estoppel.*

A director must exercise the power with which he is intrusted for the common interest of all the stockholders, and not for his private interest.

A director may sell his stock freely. But a board of directors may not sell all the property and business of the corporation under the guise of a sale of their stock, and thereby receive the entire proceeds of the sale of the corporate property to their own private use.

In an action to recover an unpaid subscription to the capital stock of a corporation, organized under the laws of Maine, the plaintiff, a director in the corporation, alleging that the claim (no certificate of stock having been issued) had been assigned to him by the corporation at the same time of a sale by its directors of all the business and property of the corporation to another company, and the proceeds of the sale not being paid into the treasury of the corporation but received by the plaintiff for his own benefit,— and the defendant getting nothing, *held;* that the plaintiff's acts were in entire disregard of the rights of the defendant as a stockholder, and as to the defendant, they were fraudulent; *also;* that the claim assigned cannot be enforced, and that the plaintiff gained no rights against the defendant by virtue of the assignment.

In this case, the directors and treasurer of the corporation owned all the stock that had been issued. *Held;* that while the principal trade was a sale, in form, of all the issued stock to another company, it was, in substance, the sale of all the business and property of the corporation, (except the choses in action assigned to the plaintiff,) accompanied with a delivery of all the corporate property to the purchaser.

The court finds that, for the following among other reasons, upon the facts reported, there was a sale of all the property and business of a corporation, rather than a mere transfer of its capital stock:—The purchaser understood that it was purchasing all the stock of the corporation, and as such purchaser took and used accordingly all the property of the corporation; it obtained the good-will and trade of the corporation and carried out all its contracts; it made no further use of the corporation, whose organization, business and books were not kept up; the treasurer, the plaintiff, after the sale did not know what had become of the property of the corporation; and failed to pay into the treasury the proceeds of the sale, a portion of which arose from a sale of the plaintiff's other property which he was thereby enabled to sell at the same time.

*Held;* that the defendant, not being cognizant of the proposed trade for the sale of the corporation's assets, cannot be estopped from avoiding the assignment on the ground that, having a full knowledge of the facts, he allowed the corporation to receive the benefits of the contract.

ON REPORT.

This was an action of assumpsit to recover the sum of two thousand dollars. The declaration sets out in substance that on the first day of June, 1895, the defendant, Ralph W. Bartlett, subscribed for thirty shares of the capital stock of the New England Milk Company, which thirty shares amounted at par value to three thousand dollars; that the defendant only paid one thousand dollars on this subscription, leaving a balance unpaid of two thousand dollars; that on the ninth of November, 1896, the said New England Milk Company for value received assigned the defendant's unpaid subscription for stock to the plaintiff, John F. Cusick, and that by virtue of this assignment the defendant became liable and promised to pay to the plaintiff the sum of two thousand dollars on demand.

To the plaintiff's declaration the defendant pleaded the general issue, with a brief statement of special matters of defense, and filed as a set-off a claim against the corporation.

A summary of the evidence reported is as follows:—

For some time previous to June 1st, 1895, John F. Cusick, the plaintiff, had been a student in the office of Ralph W. Bartlett, the defendant, a Boston attorney. There was at this time in Boston a combination of milk companies called the New England Dairy Association and more commonly called the Boston Milk Trust. A large part of the business of this Boston Milk Trust was bringing in milk from the country and selling it to local dealers, both whole-sale and retail, in the city. Cusick, previous to his entering Mr. Bartlett's office, had for many years been engaged in the milk business in Boston, and while he was studying in the defendant's office, the matter of establishing a business in competition with the milk trust was frequently talked over, and sometime in May, 1895, it was practically decided by the plaintiff and defendant to start such a business. Cusick, the plaintiff, went to Connecticut to make arrangements with farmers for a supply of milk, and it being necessary, in order that he might have credit with the farmers, that money should be on deposit, Mr. Bartlett gave Mr. Cusick on May 31st, 1895, the sum of one thousand dollars to deposit for this purpose, and Cusick putting with it three thousand dollars of his own, deposited the whole four thousand dollars in a Connecticut bank under the name New England Milk Company.

On June 1st, 1895, Mr. Bartlett, Mr. Cusick and one James O'Bierne, a friend of Mr. Cusick's, came to Portland and organized a corporation, under the laws of Maine, called the New England Milk Company, the object of the corporation being to carry on the business of milk. contractors in and about Boston. The capital stock of the company was fixed at ten thousand dollars, divided into one hundred shares, with a par value of one hundred dollars each. At the meeting of incorporators a subscription list was opened. The plaintiff, John F. Cusick, subscribed for thirty shares of stock, amounting at par value to three thousand dollars, the defendant subscribed for the same amount, and Mr. O'Bierne subscribed for ten shares. The three thousand dollars deposited by Mr. Cusick in the bank was considered a payment of his subscription, and the one thousand dollars of Mr. Bartlett's deposited in the bank was

considered a part payment of his subscription. The usual business was transacted at this organization meeting. A code of by-laws was adopted, and a board of officers elected as follows :—President, John F. Cusick, the plaintiff; treasurer, Ralph W. Bartlett, the defendant; and directors, John F. Cusick, Ralph W. Bartlett and James O'Bierne. Mr. Cusick was to act as business manager of the concern, and the three persons above named were the only persons interested.

The enterprise was very slow in getting under way. The idea was to have a special car run from Connecticut into Boston every morning with the milk. This car could not be obtained at once. All the milk, that came in, came in as freight on other cars and was all used by Mr. Cusick in his private business. The business was in such a confused state that Mr. Cusick himself could not tell whether it was done in the name of the New England Milk Company or in his own name. Mr. Bartlett was not satisfied with this confused state of affairs. There were frequent disputes between the parties interested, and especially between Mr. Cusick and Mr. Bartlett; and at a director's meeting, held on September 18th, 1895, Mr. Bartlett becoming dissatisfied with the way the company was managed, and with the whole matter, tendered his resignation, and announced his determination to withdraw absolutely from the company. His resignation was tabled, and the meeting adjourned with an agreement between Mr. Cusick, Mr. O'Bierne and Mr. Bartlett that they would meet again in the evening and talk the matter over. In the evening they met as agreed. The testimony as to what took place at this meeting is conflicting. Bartlett and another witness present both testify that he still insisted upon withdrawing from the company, and refused absolutely to go on with it in any capacity. They say an understanding was arrived at, and agreed upon by Mr. Cusick, Mr. O'Bierne and Mr. Bartlett that Mr. Bartlett might withdraw from the company. No stock had ever been issued to Mr. Bartlett up to this time, although stock had been issued to Mr. Cusick and Mr. O'Bierne. It was claimed that Mr. Bartlett agreed not to call for any stock in the company, and the one thousand dollars that he had paid in was to

be considered a loan to be paid back to him. Mr. Bartlett says the balance of his subscription was not to be demanded of him as a subscription, but he agreed that, if it was needed, he would loan it to the company upon notes indorsed by Cusick and O'Bierne, and he was to continue to work with the company as treasurer and help them along until some one could be found to take his place.

Mr. Bartlett did not see the plaintiff again until the latter part of December, 1895. After the director's meeting of Sept. 18th, 1895, above referred to, Mr. Cusick, the plaintiff, went to Connecticut to see about obtaining milk, was taken sick with typhoid fever and did not get out to attend to business until late in December.. In the meantime Mr. Bartlett, although he was unfamiliar with the milk business, kept up the work and did all that he could to keep the company going. He testifies that he considered, and understood, that, as between himself, Mr. Cusick and Mr. O'Bierne, who were the only persons interested in the company, he was released and out of the company, but no one having been found to fill his place, he kept at work as treasurer and in fact ran and managed the whole business during Mr. Cusick's illness.

When Mr. Cusick did get out in December, Mr. Bartlett expected that the matter of his leaving the company would be arranged as talked in September. But Mr. Cusick and Mr. O'Bierne then took an entirely different stand. At times they would deny that they had ever reached any agreement with him about his withdrawal from the company. Sometimes they would treat him as a stockholder, and. at other times as though he had no interest whatever in the company, so that he could not tell what their real position was. He continued, however, to draw checks as treasurer, and to act for the company in this capacity until shortly after July 21st, 1896. Up to this time no one had been interested in the company except Mr. Cusick, Mr. Bartlett and Mr. O'Bierne. On July 20th, 1896, Mr. Cusick transferred a share of his stock to his brother, W. H. Cusick, and on July 21st, at an adjournment of the annual meeting of the stockholders, Mr. Bartlett's name was dropped from the board of officers and a new board was elected as follows:—James O'Bierne, president; John

F. Cusick, the plaintiff, treasurer; and James O'Bierne, John F. Cusick and W. H. Cusick, directors. From this time on Bartlett had nothing further to do with the company's affairs except that in some matters he continued to act as counsel for it.

About November 1st, 1896, it came indirectly, and by chance, to Mr. Bartlett's attention that certain negotiations were being carried on between Mr. Cusick, the plaintiff, and one George O. Whiting, the head man of the Boston Milk Trust, in regard to the disposal of the property and business of the New England Milk Company. Mr. Bartlett inquired of Mr. Cusick in regard to the matter and was told that there were no such negotiations pending; that the only negotiations Mr. Cusick had on hand were for the sale of his private milk route, but upon further inquiry Mr. Bartlett's suspicions were confirmed. George O. Whiting, above-named, and F. G. Holcombe, attorney for the Elm Farm Milk Company, one of the corporations in the Milk Trust, testified that during the month of September and October the Elm Farm Milk Company, through George O. Whiting and Mr. Holcombe, were negotiating with Mr. Cusick in regard to the purchase, as they expressed it, of the New England Milk Company. They desired to buy, and proposed to buy, the property, assets, business, good-will, and everything else of the New England Milk Company. At the same time they were incidentally considering the purchase of Mr. Cusick's private milk route,—Mr. Cusick finding it necessary to dispose of this route if he was going to part company with the New England Milk Company. The purchase of this private milk route was apparently made one of the conditions, or part of, the sale of the New England Milk Company.

Mr. Cusick and Mr. Whiting went over and estimated the value of the private milk route, and of the property and business of the New England Milk Company, and, as Mr. Whiting testifies, agreed upon thirteen thousand dollars as a lump sum for the whole business. Mr. Whiting, however, insisted that he would not take the New England Milk Company unless it was free from debt. The proposition of Mr. Whiting and the Elm Farm Milk Company was to buy the property and business of the New England Milk

Company. This was the original plan, but it was found undesirable by Mr. Cusick to go through the "machinery" of getting authority from the stockholders of his company for a sale of the company's property and business. He decided not to try to transfer the property of the company to the Elm Farm Milk Company, but he represented to Mr. Whiting and to Mr. Holcombe that there were only seventy shares of stock issued, or that could be issued by the New England Milk Company, and that this stock was all held by himself, Mr. O'Bierne and his brother, Mr. W. H. Cusick; that instead of transferring the property and business to the Elm Farm Milk Company they would transfer all of this stock, and in that way the Elm Farm Milk Company would be taking the whole concern. The lump sum of thirteen thousand dollars, which had been agreed upon as the price for the property and business of the New England Milk Company, and Mr. Cusick's private milk route, was then divided on paper into seven thousand dollars for the seventy shares of stock of the New England Milk Company held by Mr. Cusick and his friends, and six thousand dollars for Mr. Cusick's private milk route. As has already been stated, one of the conditions of the trade was that all of the debts of the New England Milk Company were to be assumed by Mr. Cusick, and a bond was taken from him by the Elm Farm Milk Company to the effect that he would pay these debts, and the last act of the three directors of the New England Milk Company, Mr. Cusick, Mr. O'Bierne and Mr. W. H. Cusick, who were all interested in this transaction, was to hold a directors' meeting and authorize Mr. O'Bierne, the president of the company, and Wm. H. Cusick, a director, to effect for the company, and in its name, a general assignment to John F. Cusick of all the bills receivable of the New England Milk Company upon consideration that he pay the company's indebtedness. According to Mr. Cusick's testimony this agreement, or assignment, was part and parcel of the deal of selling out the company. The contract was executed in an unusual and peculiar way. The by-laws of the company provided that no contracts, notes or other obligations should be valid unless signed by the president and treasurer. This contract or assignment of

the bills receivable to Mr. Cusick, which is the assignment upon which the plaintiff in this case bases his right to recover, was not executed by the president and treasurer, as required by the by-laws, but by the president and W. H. Cusick, a director.    No ratification of the assignment, or of its execution, was ever had in any way by the corporation or its stockholders, or by any board of directors other than the directors who signed the contract, and who were all interested personally in the deal.

Through all these negotiations with the Elm Farm Milk Company, the testimony of Mr. Holcombe and Mr. Whiting is, that Cusick never told them that Mr. Bartlett was in any way interested in the stock of the New England Milk Company, or that he was owing the company any balance of an unpaid subscription for stock. On the contrary, they say that Mr. Cusick represented that the seventy shares of stock which he, Mr. O'Bierne and W. H. Cusick held, comprised all of the stock of the company outstanding, and that by the purchase of it, the Elm Farm Milk Company would be acquiring the New England Milk Company as thoroughly as by a transfer of its property.    Mr. Bartlett was not recognized in any way as a stockholder in the New England Milk Company throughout these dealings and this transaction.    He knew in the beginning that such negotiations were on foot, although Mr. Cusick attempted to conceal this fact from him by stating that the only deal on foot was the sale of his private milk route.    This was not disputed by Mr. Cusick.    A few days later Mr. Bartlett inquired of Mr. Holcombe what had been done and Mr. Holcombe told him that he did not think the deal would go through.    He did not know that the deal had been carried out until a month or more after it was accomplished, when he learned of the matter accidentally; and at about the same time he learned of the accomplishment of the deal, Mr. Cusick began this proceeding to collect by virtue of the assignment, obtained as above stated, two thousand dollars which he claimed was unpaid on Mr. Bartlett's subscription.

*Robert Treat Whitehouse,* for plaintiff.

The subscription agreement was legal in form.    *Ken. & Port. R. R. Co.* v. *Jarvis,* 34 Maine, 360; *Ken. & Port. R. R. Co.* v.

*Palmer,* 34 Maine, 366 ; *Penob. R. R. Co.* v. *Dummer,* 40 Maine, 172 ; *Skowhegan, etc., R. R. Co.* v. *Kinsman,* 77 Maine, 320.

All conditions prescribed by law were complied with. Morawetz, § 56 ; *Penob. R. R. Co.* v. *Dummer,* 40 Maine, 173 ; *Chaffin* v. *Cummings,* 37 Maine, 76.

It was not necessary for certificates to be issued to the defendant in order to render him liable as a stockholder. Morawetz, § 56 ; *Chaffin* v. *Cummings,* 37 Maine, 76.

Defendant's evidence wholly fails to establish facts claimed by him in regard to release. Even if there had been a release it was waived by the defendant. *Penob. R. R. Co.* v. *Dunn,* 39 Maine, 587.

The assignment is not avoided by the failure of the treasurer to sign it as required by the by-laws. The tendency of modern courts is not to regard themselves as bound by provision in statutes, charters or by-laws prescribing that corporate contracts shall be signed by certain officers. Cook on Stock, etc., § 325.

The by-law in question does not apply to any contracts expressly authorized by the board of directors. *Barnes* v. *Ontario Bank,* 15 N. Y. 155, (1859); *Morrill* v. *C. T. Segar Mfg. Co.,* 32 Hun, 543, (1884).

Even if the assignment were not legally executed it would not be void but voidable only at the election of the corporation. Thompson's Commentaries, §§ 5286, 5291.

The approval of the corporation is presumed and the contract stands till avoided by the corporation and the latter has never elected to avoid. *Wallace* v. *Long Island R. R. Co.,* 12 Hun, 46 ; *Union Pacific R. R. Co.* v. *Credit Mobilier,* 135 Mass. 367 ; *Duncomb* v. *New York, etc., R. R. Co.,* 22 Hun, 133.

When a contract intra vires and free from fraud is approved in effect by a majority of its stockholders, it cannot be avoided at the instance of a minority stockholder. Cook on Stock and Stockholders, § 684 ; Morawetz, § 477.

Even if the defendant had a right to avoid the contract, the corporation and the defendant with full knowledge of the facts allowed the company to receive and retain the benefits of the contract and

they are estopped to avoid it. · Thompson's Commentaries, § 5286, § 5291, § 5303, and authorities there cited; *Kelley* v. *Newburyport R. R. Co.*, 141 Mass. 499; *Rolling Stock Co.* v. *R. R. Co.*, 34 Ohio, 450; *Jesup* v. *Ill. R. R. Co.* 43 Fed. Rep. 483; *Twin-Lick Oil Co.* v. *Marbury*, 91 U. S. 591.

It was entirely within the power of the board of directors to assign all the accounts and rights of action of the corporation in consideration of the payment of all its debts.    Morawetz, § 573; *Sargent* v. *Webster*, 13 Met. 497.

. The contract containing the assignment is not avoided by the fact that it was made between the corporation and one of its directors.

There is no principle of law or equity which should prevent a corporation contracting with a director where there is a quorum of directors on the other side of the contract and it is done in good faith.    Thompson's Commentaries, § 4059;    Morawetz, § 527; *Rolling Stock Co.* v. *Railroad*, 34 Ohio, 450, (1878); *Jesup* v. *Illinois Cen. R. R. Co.*, 43 Fed. Rep. 483, (1890); *Metrop. Tel. Co.* v. *Dom. Tel. Co.*, 44 N. J. Eq. 573, (1888); *Flagg* v. *Manhattan Ry. Co.*, 10 Fed. Rep. (N. Y.,) 433, (1881).    (Contra.) *Railway Co.* v. *Blaikie*, 1 Macq. H. L. Cases, 461, (1852); *Stewart* v. *Lehigh Valley R. R. Co.*, 38 N. J. Law, 523, (1875). (Distinguished.)    *E. & N. A. Ry. Co.* v. *Poor*, 59 Maine, 277, (1871); Beach on Private Corporations, § 402;    Cook on Stockholders, § 652; *Colliery Co.* v. *Black*, 37 L. T. 74, (1878).

Contracts of a director with the corporation will be upheld when free from actual fraud.    *Combination Trust Co.* v. *Weed*, 2 Fed. Rep. 24, (1880); *Hubbard* v. *Investment Co.*, 14 Fed. Rep. (Mass.) 675, (1882); *Barr* v. *Plate Glass Co.*, 51 Fed. Rep. 33, (1892); *Twin-Lick Oil Co.* v. *Marbury*, 91 U. S. 589; *Pneumatic Gas Co.* v. *Berry*, 113 U. S. p. 322, (1884); *Leavenworth* v. *Chicago, etc., Railway Co.* 134 U. S. 688, (1889); *Stock Bank* v. *U. S. Pottery Co.*, 34 Vt. 148, (1861); *Saltmarsh* v. *Spaulding*, 147 Mass. 230; *Harts* v. *Brown*, 77 Ill. 230, (1875); *Smith* v. *Townsend*, 27 Md. 388; *Pairo* v. *Vickery*, 37 Md. 467; *Cumberland Co.* v. *Parish*, 42 Md. 686; *Smith* v. *Skeary*, 47 Conn. 47; *Conyngham's Appeal*,

52 Pa. 474; *Ashurst's Appeal*, 60 Pa. 304; *Watts' Appeal*, 78 Pa. 320.    *County Court* v. *Baltimore*, 35 Fed. Rep. 167; *Garrett* v. *Burlington Plow Co.*, 20 Iowa, 697; *Bank* v. *Flour Co.*, 41 Ohio St., 352; *Hancock* v. *Holbrook*, 40 La. An. 53.

According to the most extreme view a contract even with a majority of directors would not be held void but only voidable at the election of the corporation.    *Aberdeen Ry. Co.* v. *Blaikie*, 1 Macq. 461; *Railway Co.* v. *Magenay*, 25 Beavan, 586; *Flanagan* v. *R. R. Co.*, L. R. Eq. 116; *Michaud* v. *Girod*, 4 How. (U. S.) 503; *Koehler* v. *Iron Co.*, 2 Black, (U. S.) 715; *Wardell* v. *Railroad Co.*, 103 U. S. 651; *Thomas* v. *Brownville R. R. Co.*, 109 U. S. 522; *Hubbard* v. *New York Co.*, 14 Fed. Rep. 675; *Bill* v. *Tel. Co.* 16 Fed. Rep. 14; *Meeker* v. *Winthrop Iron Co.*, 17 Fed. Rep. 48; *Europ. & No. Am. R. R. Co.* v. *Poor*, 59 Maine, 277; *Kelley* v. *Newburyport R. R. Co.*, 141 Mass. 499; *Gardner* v. *Ogden*, 22 N. Y. 327; *Butts* v. *Wood*, 37 N. Y. 317; *Coleman* v. *Second Ave. R. R. Co.*, 38 N. Y. 317; *Cumb., etc., R. Co.* v. *Sherman*, 30 Barb. (N. Y.) 553; *Duncomb* v. *R. R.*, 22 Hun, 133; *Stewart* v. *R. R. Co.*, 38 N. J. Law, 523.

The plaintiff had a perfect right to sell his stock to a competing company whether he knew that the latter intended to wind up the New England Co. or not.    Thompson's Commentaries, § 2300; Cook on Stockholders, § 386; Beach, Corp. § 613; *Barnes* v. *Brown*, 80 N. Y. 527, (1880); *Rice* v. *Rockefeller*, 134 N. Y. 174, (1892); *Moffatt* v. *Farquhar*, L. R. 7 Ch. Div. 59; *Trisconi* v. *Winship*, 43 La. An. 45.

*C. A. Hight*, for defendant.

Assignment void because not executed as required by the by-laws.    Morawetz, Corp. §§ 500, 582; Beach, Corp. 321; Cook, Stock, etc., § 725.    By-Laws binding on corporation.    *Came* v. *Brigham*, 39 Maine, 38.

Again in *Cummings* v. *Webster*, 43 Maine, 197, the court said:—"The by-laws of the company made in pursuance of their charter are equally as binding on all their members, and others acquainted with their method of business, as any public law of the State."

In *Robbins* v. *Mfg. Co.*, 75 Ga. 238, it was held to be settled

law, that the agents of a corporation must observe all the formalities which are required by the charter of the company to be observed in a corporate transaction; and if they act in a manner not authorized by the company's charter, their acts will not be binding; and when the charter of the company requires a contract to be executed in a particular way, the contract will be invalid unless executed in the manner prescribed. The case further holds that such terms are not only directory, but they are mandatory, and even a majority are not at liberty to disregard them, since they constitute a part of the fundamental agreement between the shareholders. See also *Bank* v. *Erwin*, 31 Ga. 376; *Dane* v. *Young*, 61 Maine, 160; *Blanchard* v. *Association*, 59 Maine, 202; *Wetherly* v. *Society*, 76 Ala. 567; *Gillett Rec.* v. *Phillips*, 13 N. Y. 114; *Gillaway* v. *Hamilton*, 68 Wis. 651; *Badger* v. *Ins. Co.* 103 Mass. 244; *Whitney* v. *Ins. Co.*, 129 Mass. 241; 2 *A. & E. Enc. of Law*, pp. 709–710; *Hotchin* v. *Kent*, 8 Mich. 526.

The law does not allow directors to manipulate and manage, buy, sell and dispose of the property and assets of the corporation for their own gain and to the exclusion or to the detriment of the interests or rights of any individual shareholder; and it is further established as a settled rule of law that whatever a trustee, agent or director cannot do directly and openly he cannot do by indirect and roundabout means. Morawetz on Corporations, §§ 516, 517, 524; Spelling on Private Corporations, §§ 428, 429, 432; Beach on Pri. Corporations, § 240, et seq.; Cook, Stock & Stockholders, § 653; 17 Am. & Eng. Enc. of Law, pp. 91, 123; Meecham on Agency, Chap. 2, §§ 461, 462, 463. The two leading Maine cases are: *Railway Co.* v. *Poor*, 59 Maine, 277; *Clay* v. *Towle*, 78 Maine, 86.

"Selling the entire corporate property to another corporation, or, what is in practical effect the same thing, leasing it for 999 years, is such a fundamental change as releases a dissenting subscriber. If this cannot be done with the authority of the Legislature, so as to bind a dissenting stockholder for stronger reasons, it cannot be done without authority of law." Thomp. Com. on Corp. § 1295.

A corporation must show performance in good faith of agreement on its own part before it can recover from a subscriber. A corporation cannot vary the conditions of the contract without consent of a subscriber. *Railroad* v. *Veazie,* 39 Maine, 571, pp. 580, 581; *Railroad* v. *Ayers,* 56 Ga. 230; *Middlesex Turnpike Cor.* v. *Locke,* 8 Mass. 268; *Same* v. *Swan,* 10 Mass. 385; *Kean* v. *Johnson,* 9 N. J. Eq. 407; *Black* v. *Canal Company,* 24 N. J. Eq. 455; *H. & N. H. R. R. Co.* v. *Croswell,* 5 Hill, 384; *Union Locks* v. *Towne,* 1 N. H. 44.

The mutual consent of all the stockholders of the company, the promises on their part that the defendant should not be called upon for his subscription, and the further actions of the officers of the company in representations which they made, and in dealings which they entered into without in any way treating him as a stockholder, amounted to a release between the defendant and plaintiff, if not between the corporation itself and the defendant. Cook Stock, etc., (3d Ed.) § 168.

The assignment upon which the plaintiff relies, was obtained through a breach of the trust duties which the plaintiff and all the other directors of the New England Milk Company, by virtue of their office, owed to said corporation and to the defendant, if he was a stockholder in said corporation. The assignment was obtained in fraud of this defendant, and this suit is in furtherance of said breach of trust and said fraud. *People* v. *Township Board,* 11 Mich. 222; Morawetz, Corp. (2nd. Ed.) § 524; *E. & N. A. Ry. Co.* v. *Poor,* 59 Maine, 277.

A subscription for stock is a mutual undertaking. The corporation undertakes to do certain things in consideration of the promises of the subscriber to take and pay for stock, and if it appears in a suit by the corporation to collect a subscription that the corporation has failed to perform its part of the agreement, or has made some material change in the conditions, without the consent of the other party, it cannot then call upon the subscriber for the fulfillment of his subscription promise. *Old Town, etc., R. R. Co.* v. *Veazie,* 39 Maine, 571, and cases supra.

SITTING: PETERS, C. J., FOSTER, HASKELL, WISWELL, STROUT, SAVAGE, JJ.

SAVAGE, J. Action to recover the sum of two thousand dollars, the balance claimed to be due on defendant's subscription for thirty shares of the capital stock of the New England Milk Company, a corporation organized under the laws of this state. The plaintiff alleges that this claim has been assigned to him by the corporation. The defendant sets up several defenses, technical and substantial, only one of which, however, do we find it necessary to consider.

An examination of the evidence reveals the following material facts. The corporation in question was organized in June, 1895. The plaintiff and defendant were both among its promoters and incorporators, and they, with one O'Bierne, constituted its first board of directors. The purposes of the corporation were to carry on a general dairy business, and to buy and sell milk and cream. The par value of the shares was one hundred dollars each, and the capital stock was fixed at one hundred shares.

At the organization, the plaintiff and the defendant each subscribed for thirty shares, and O'Bierne, ten. The plaintiff paid his subscription in full, three thousand dollars. The defendant paid one thousand dollars on his subscription, and this suit is brought to recover the balance, which it is admitted has not been paid. Subsequently other shares of stock were issued and paid for. And on November 9, 1896, the date of the alleged assignment of this claim by the corporation to the plaintiff, there had been issued in all seventy shares of stock, all of which had been paid for, and all of which were then owned by the plaintiff, O'Bierne and one W. H. Cusick. The only other interest in the capital stock, at that time, was the defendant's interest, by virtue of his subscription for thirty shares of the stock, and his payment of one thousand dollars upon his subscription. But no certificate of stock had ever been issued to the defendant for any amount.

After the corporation was organized, it engaged in the milk business, buying milk in Connecticut, transporting it to Boston,

and there selling it to milk dealers. By contract with a railroad company, it had a special car for the transportation of its milk. The business was continued up to the date of the assignment, and the plaintiff testified that it amounted to $75,000 a year. During all the time that the corporation was engaged in business, the plaintiff owned and operated a private milk route, for the sale and distribution of milk in Boston, on his own account, and he purchased part of his milk from the New England Milk Company. The defendant continued to be a director of the corporation until July 21, 1896, when a new board of directors was elected, consisting of the plaintiff, O'Bierne and W. H. Cusick. These gentlemen continued to be directors until the assignment of this claim was made in the following November. Dissensions arose between the plaintiff and defendant respecting the management of the corporation, which fact is only important as throwing some light upon the transactions which followed.

In September or October, 1896, negotiations were entered into between the directors of the New England Milk Company and the managers of the Elm Farm Milk Company, a rival milk company, doing business in Boston, looking to a withdrawal of the former from business.

This result was accomplished by a series of contracts entered into by the interested parties, November 9, 1896, to take effect as of November 1. The plaintiff, O'Bierne and W. H. Cusick were all the directors of the New England Milk Company, and owned all the capital stock of the company which had been issued, and which was all of the capital stock except the defendant's interest. O'Bierne and W. H. Cusick transferred their thirty-five shares of stock to the plaintiff, (but whether as the result of a sale or for convenience merely does not appear), and the plaintiff sold and transferred these with his own thirty-five shares, seventy shares in all, to the Elm Farm Milk Company for seven thousand dollars. The plaintiff, who was general manager of the New England Milk Company, delivered all of its tangible assets, consisting of a milk shed, cans, separator, boiler and other articles used by it to the Elm Farm Milk Company; the plaintiff also sold his private milk

route in Boston to the same purchaser for six thousand dollars; the plaintiff assumed the liabilities of the New England Milk Company, and gave an indemnifying bond; and the New England Milk Company, in pursuance to a vote of the plaintiff, O'Bierne and W. H. Cusick, as directors, assigned to the plaintiff all debts and claims due to the corporation. It is under this assignment that the plaintiff derives his title to the claim in suit. The defendant contends that this assignment is void, because it was not executed in conformity to the by-laws of the corporation; he further contends that it is void as to him, because it is fraudulent. For the purposes of this case, we assume, but do not decide, that the execution of the assignment was legal.

This brings us directly to a consideration of the other defense, which raises the simple question whether this assignment gave the plaintiff a good title to the claim sued, so as to enable him to enforce it against the defendant.

The various contracts of November 9th were all component parts of one transaction, one trade, and were all contrived and agreed upon to accomplish one purpose. We cannot consider the assignment alone. We must look to all parts of the transaction, as well as to its purpose. In form, the principal trade was a sale of all the issued stock of the New England Milk Company; in substance, it was the sale of all the business and property of the corporation, except the choses in action assigned to the plaintiff. Nothing was left for the corporation. Even its good will was lost. Such we cannot doubt was the real intention of the parties. Such was the purpose of the purchaser, and that purpose, we think, was understood, and its accomplishment aided, by the plaintiff.

The plaintiff claims, indeed, that the transaction was in this respect merely a sale of stock. But the evidence satisfies us that it was adopted as a convenient, though perhaps not a strictly lawful mode of transferring to the purchaser the property of the corporation. We think this was intended by the parties. The purchaser understood that it was buying all the stock of the corporation in which any one had an interest, and as sole stockholder, it took and used the property of the corporation. It took possession of the property,

as directed by the plaintiff; it carried out the contracts with the milk producers; it continued to run the special car; it obtained the good-will and trade of the corporation. The plaintiff, who was its treasurer, and after the sale of stock, the only officer of the corporation, ceased to exercise any care or control over its property, and claimed at the trial of this case that he did not know, of his own knowledge, what had become of it. The purpose of the transfer of the stock is evident. It was to wind up the business affairs of the corporation, and take it out of the field of competition. The New England Milk Company was merged in,—or rather was swallowed up by—the Elm Farm Milk Company, its competitor. Since then the former has possessed only a theoretical existence. It has possessed no assets. It has had no good-will. It has transacted no business. It has kept no books of account. It has had no directors, and no corporate meetings. It has apparently descended to the realm of shades of departed corporations. The purchasers of its capital stock had no use for the corporation after it had been sold out of business.

Now, it needs no argument to show that by these combined transactions in which the plaintiff participated, and by which he gets his title to this claim, the value of the capital stock which the defendant is asked to pay for here, was utterly destroyed.

Although the tangible corporate assets of the New England Milk Company all passed into the possession of the Elm Farm Milk Company, and although the business and good-will of the former company passed to the latter, the New England Milk Company received nothing out of the trade. But the plaintiff was enabled thereby to sell his stock at par, and to sell his private milk route for six thousand dollars; and in addition he now seeks to recover two thousand dollars on a subscription for stock in the wrecked corporation, which was rendered worthless by the acts of the directors, in which he participated. By resorting to the sale of stock as a means of transferring the corporate property,—and that is what was really done,—the proceeds of the sale went into the pockets of the plaintiff, who then also held the stock of his associates, and not into the treasury of the corporation. The plaintiff

received the entire benefit of the trade, whatever it was, and the defendant has got nothing. On the other hand, if the corporate property had been sold, in form, as it was in effect, to the Elm Farm Milk Company, the proceeds would have gone into the treasury of the New England Milk Company, and would have inured to the benefit of all the stockholders proportionately, to the defendant as well as to the plaintiff. For the defendant, though he held no certificate, was a stockholder. *Chaffin* v. *Cummings*, 37 Maine, 76.

An examination of the actual results of the transaction show this in even a clearer light.

The book-keeper of the corporation, a witness for the plaintiff, testified that on November 1, 1896, the cash on hand was $349.79; bills considered good amounted to $4,781.94. These items, amounting to $5,131.73, came to the plaintiff by assignment. The proceeds of the sale to the Elm Farm Milk Company were $7000, and if the unpaid subscription of the defendant, $2000, was an asset, as the plaintiff claims it was, the total assets of the corporation amounted to $14,131.73. There is besides an item of doubtful accounts, $2,547.87, which we do not take into account. Prior to November 9, 1896, all of these assets belonged to the corporation, and the defendant had a right to have their value, which it seems amounted to the sum of $14,131.73, if he paid the balance of his subscription, or $12,131.73, if he did not, applied to the purposes of the corporation. The liabilities amounted to $8,529.72. After payment of the debts, there would have remained, in the one case $5,602.01 for all the stockholders, or $3,602.01 in the other case. The defendant would have been entitled to thirty-hundredths of the former sum or ten-eightieths of the latter, according to whether he had paid the balance of his subscription or not. The defendant not having paid, the plaintiff received the net sum of $3,602.01. The defendant, although he had contributed one-eighth of the capital stock, received nothing. So far as the defendant is concerned, it is immaterial in what proportions the retiring stockholders received the money, relatively to each other, if the plaintiff was acting for

them, nor whether the plaintiff by assuming the bills payable and taking the bills receivable was a gainer or loser. We have only to consider the nature and effect of the plaintiff's acts so far as they affect the defendant's rights. The plaintiff now seeks to recover $2000 more of the assets for his own use, and this, if allowed, will make a total amount of $5,602.01 received, in one way and another, by the plaintiff, out of the trade; while the defendant will have a minority holding of thirty shares in a corporation which the plaintiff and his associate directors have stripped and made derelict.

In view of the circumstances of this case, may the plaintiff be permitted to recover? We think not. The acts of the plaintiff on November 9, the sale of his stock, the delivery of the corporate property to the purchaser of the stock, the obliteration of the business and good-will of the corporation, were all for his personal benefit, and in entire disregard of the rights of the defendant as a stockholder. These acts were a breach of the trust duties which the plaintiff as a director owed to the defendant as a stockholder; as to the defendant, they were fraudulent. The plaintiff did not use towards the defendant that good faith which the law, as well as good morals, requires of a director of a corporation. A director may sell his stock freely. That is his right. But a board of directors may not sell all the property and business of the corporation under the guise of a sale of their stock, and thereby receive the entire proceeds of the sale of the corporate property to their own private use. Nothing can be plainer than this. The proposition is elemental that a director in dealing with corporate matters must exercise the power with which he is intrusted for the common interest of all the stockholders, and not for his private interest. To hold, in this case, that the plaintiff may recover on a subscription for stock which he himself has rendered of no value, would be as much as to say that a director may stab a stockholder with one hand, and at the same time pluck him with the other.

The plaintiff claims that the defendant was cognizant of the trade proposed with the Elm Farm Milk Company, and with full knowledge of the facts allowed the corporation to receive the bene-

fits of the contract, and that therefore he is estopped to avoid the assignment. But the evidence fails to show that the defendant was informed of all the facts, or how his rights were affected, until weeks after the trade was consummated. Besides, he is not seeking to avoid anything the plaintiff has done under the assignment. He is simply resisting the attempt of the plaintiff to enforce it against him. This is the first opportunity he has had to resist. He is not estopped. The plaintiff gained no rights against the defendant by virtue of the assignment.

As the plaintiff cannot recover as assignee, we do not consider the account in set-off filed by the defendant, which is against the assignor, the New England Milk Company.

*Judgment for defendant.*